J-S34030-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: M.G., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.G. | No. 180 WDA 2014 |

Appeal from the Order January 3, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): TPR 059 of 2013

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and OTT, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED AUGUST 1, 2014**

Appellant, R.G. ("Mother"), appeals from the order involuntarily terminating her parental rights to M.G. (born in June of 2002) ("Child"), pursuant to 23 Pa.C.S. § 2511(a) (2), (5), (8), and (b).[1] We affirm.

The parties first became known to the Allegheny County Office of Children, Youth, and Families ("CYF") in June of 2002 as a result of receiving a referral concerning Mother's house, her instability, and Mother's inability to care for Child. N.T., 8/16/13, at 15. CYF did not open a case at that time. N.T., 8/16/13, at 15. The trial court accurately set forth the following procedural history:

> In December 2003, CYF received reports that Mother was not feeding Child, Mother was not following up with Child's medical appointments, and that Mother's housing situation was

_____

[1] J.C. ("Father") was named on CYF's petition to terminate the parental rights of both parents. However, Father is not a party to the current appeal, nor has he filed a separate appeal.

unstable. After investigation, CYF closed the case on February 25, 2004.

In August 2004, CYF received reports that Mother was hitting Child in the face and was overwhelmed by Child's behaviors. After investigation, CYF closed [the] case in November 2004. In November 2006, CYF received reports that Mother did not have heat in her home, and that Mother was not appropriately supervising Child. At that time, CYF accepted the case for services. On March 6, 2008, CYF filed a Petition for Dependency, alleging that Mother had housing and drug issues, and that Child had mental health and behavioral issues. CYF referred Mother for a drug and alcohol evaluation through POWER. Mother underwent two POWER assessments in November 2006 and October 2007, but Mother did not obtain the recommended drug treatment. CYF withdrew its dependency petition in August 2008. In October of 2009, CYF closed the case.

On October 26, 2010, CYF received its fifth referral involving Mother. Upon investigation, CYF discovered that: Mother's home was deplorable; she had no utility services, and she was being evicted due to not paying rent. CYF accepted the case for services and the case has not closed since.

In addition to CYF's concerns about Mother's housing, CYF also had concerns about Mother's drug and alcohol issues because Mother admitted to smoking marijuana. Mother completed another POWER assessment and was recommended to follow up with outpatient therapy and mental health services at Mercy Behavioral Health. Mother did not obtain, or participate with, treatment at Mercy Behavioral Health. In early December 2010, Child and Mother were residing with Mother's family friend, Ms. Lucille Evans. After Child alleged that Ms. Evans was hitting him, Ms. Evans requested that Child leave her home.

Consequently, in mid-December 2010, Child began residing with [C.H.], his half-sibling's father. At that time, Mother remained in the home of Ms. Evans.

In early January 2011, Child moved, yet again, to the home of Ms. Ann Meyers, special education teacher at his school.

While Child was in her care, Ms. Meyers observed that Child experienced behavioral and emotional problems, including expressed anger and aggression. Child stated he wished he

were dead and locked himself in his locker with a lanyard around his neck like a noose.

In January 2011, while Child was still residing with Ms. Meyers, his school discovered a Swiss Army knife and what the school interpreted to be Child's suicidal goodbye letter. As a result, on January 19, 2011, Child was involuntarily committed and transferred to Southwood Psychiatric ("Southwood").

Trial Court Opinion, 1/9/14, at 2-5.

On January 27, 2011, while Child was committed to Southwood, CYF obtained an Emergency Custody Authorization, permitting the removal of Child from Mother. On March 29, 2011, after an evidentiary hearing, Child was adjudicated dependent. The trial court ordered that Child be placed in an Individual Residential Treatment ("IRT") foster home, which is a specialized foster home for children who have severe mental health and behavioral issues, upon his discharge from Southwood. On May 10, 2011, Child was discharged from Southwood and entered an IRT foster home through NHS Human Services. On March 6, 2012, and March 21, 2012, Mother tested positive for Tetrahydrocannabinol ("THC").

On March 28, 2012, Child was re-admitted to Southwood due to a severe deterioration of Child's behavior. On July 2, 2012, Child was placed in the Wesley Spectrum IRT foster home of T. C. ("Foster Mother") and D.C. ("Foster Father"). Since that time, Child has remained in this placement.

On March 14, 2013, CYF filed a petition to involuntarily terminate the parental rights of Mother to Child. On July 19, 2013, August 16, 2013, August 27, 2013, September 6, 2013, September 24, 2013, and October 4,

2013, the trial court held hearings on the termination petition. At the hearings, Grant Walker, a CYF caseworker; Jeffrey Doran, supervisor at Wesley Spectrum Services; Eric Bernstein, Ph.D., a court-appointed psychologist; Dale J. Hindmarsh, M.D., Child's psychiatrist; and T.C., Foster Mother; and Mother testified. On January 3, 2014, the trial court entered its order terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Mother raises the following issue.

1. Did the trial court abuse its discretion and/or erred as a matter of law in concluding that termination of [Mother]'s parental rights would serve the needs and welfare of Child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 5.

Our standard of review regarding orders terminating parental rights is as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *Id.* at 806. We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003). Additionally, this Court "need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004).

The termination of parental rights is controlled by 23 Pa.C.S.A. § 2511. Under this statute, the trial court must engage in a bifurcated process in which it initially focuses on the conduct of the parent under Section 2511(a). *See In the Interest of B.C.*, 36 A.3d 601 (Pa. Super. 2012). If the trial court determines that the parent's conduct warrants termination under

Section 2511(a), it must then engage in an analysis of the best interests of the child under Section 2511(b). *See id.*

In the instant case, Mother does not challenge the trial court's analysis as it relates to her conduct under Section 2511(a); but rather, she limits her argument to the trial court's analysis of the best interests of Child under Section 2511(b).

Section § 2511(b) provides, in pertinent part:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

Pursuant to Section 2511(b), the trial court must take into account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000) (*en banc*).

> In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." In addition, we instructed that the orphans' court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008).

While a parent's emotional bond with his or her child is a major aspect of the Subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010):

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

Mother argues that CYF's evidence failed to rise to the level of clear and convincing evidence that termination of Mother's parental rights would serve the needs and welfare of Child. Mother's Brief at 16. Mother argues that severance of the parent-child bond would be detrimental to Child. *Id.*

Here, the trial court found termination of Mother's parental rights is appropriate in order to provide Child with the necessary permanence to support the developmental, physical, and emotional needs and welfare of Child. Trial Court Opinion, 1/3/15, at 21. Dr. Bernstein and Dr. Hindmarsh testified that termination of Mother's parental rights would be in the best interests of Child's developmental and emotional needs and welfare. While Dr. Bernstein testified that Mother and Child have a "strong connection," Dr.

Bernstein concluded "the connection between them in one way or another is not healthy or conducive in meeting Child's needs." N.T. 9/6/ 13, at 75, 88, 116. Moreover, Dr. Hindmarsh testified that the relationship between Mother and Child is important to Child, but he described Child as a "parental child" who feels responsible for whether Mother is doing okay. N.T., 10/4/13, at 23-24. Dr. Hindmarsh concluded that Mother's and Child's relationship is "not a normal or healthy situation" because children "should be able to be count on the predictability of life at home. . . and that they don't have to be the one looking after things at home." *Id.*

The trial court found that Foster Parents participate consistently in clinical meetings, and are very nurturing toward Child. Trial Court Opinion, 1/9/14, at 20. The trial court also found that Child looks to Foster Parents for security and support. *Id.* The trial court found that Child has "not required further hospitalization, he is generally doing well in school, he is very comfortable with Foster Mother, and he has handled some difficult and stressful situations without falling apart." Trial Court Opinion, 1/9/14, at 19-20.

Additionally, Dr. Hindmarsh testified that Child is very comfortable with Foster Mother. N.T., 10/4/13, at 18. Dr. Hindmarsh stated that Foster Mother will allow Child to continue to experience the predicable support that he has been receiving and will allow Child to continue progress. *Id.* at 26, 49. Furthermore, Dr. Bernstein testified that foster parents provide Child

with a "stable, safe, and emotionally supportive home." N.T., 9/6/13, at 113. Dr. Bernstein believes that termination of Mother's parental rights will provide Child with clarity about his placement, and continue Child's progress and positive adjustment in foster care. *Id.* at 86. *See In re T.S.M.*, 71 A.3d 251 (Pa. 2013) (stating that the strong parent-child bond was an unhealthy one that could not by itself serve as grounds to prolong foster care drift). We have stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008).

Based on our review of the record, we conclude that the trial court did not abuse its discretion in terminating Mother's parental rights to Child pursuant to section 2511(b). We therefore affirm the termination of Mother's parental rights pursuant to § 2511(a) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/1/2014